BMO Harris Bank, N.A., Plaintiff,

v.

European Motor Works and Gigi Chan,
Defendants,

Gregory Kleynerman, Defendant-Respondent,

Scott H. Smith, Defendant-Appellant.

Court of Appeals

*No. 2015AP924. Submitted on briefs May 3, 2016.
—Decided November 8, 2016.*

2016 WI App 91

(Also reported in 889 N.W.2d 165.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Timothy M. Hansen*,

*Andrew J. Kramer* and *Danielle Nardick* of *Hansen, Reynolds, Dickinson, Crueger LLC* in Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Eugene Bykhovsky* of *Bykhovsky Law LLC* in Milwaukee.

Before Curley, P.J., Brennan and Brash, JJ.

¶ 1. CURLEY, P.J. This appeal concerns a claim for contribution by defendant-appellant Scott H. Smith (Smith) against defendant-respondent Gregory Kleynerman (Kleynerman) arising from debts owed by European Motor Works, LLC (EMW), a limited liability company in which Smith and Kleynerman each held a fifty percent interest. Smith appeals the trial court's grant of summary judgment in favor of Kleynerman and the subsequent dismissal of Smith's contribution claim. On appeal, Smith argues that the trial court erred in granting Kleynerman's motion for summary judgment and dismissing Smith's contribution claim because: (1) Smith paid more than his fair share of the amount paid to discharge Smith's and Kleynerman's joint obligation to guaranty the debt of EMW; and (2) Kleynerman should be required to contribute to the attorney's fees Smith paid for EMW's defense.[1] For the reasons explained below, we affirm the trial court's grant of summary judgment in favor of Kleynerman as to Smith's contribution claim regarding the settlement payment, but we reverse and remand for further

---

[1] Smith also identifies a third issue on appeal: whether the trial court erred when it decided the issue of contribution based upon a third party's motivations in collecting the underlying debt. Because we conclude that Smith is not entitled to contribution for the amount he paid to settle the obligation because he did not pay more than his fair share, we do not directly address this issue.

proceedings in regard to Smith's contribution claim as it relates to his claim for attorney's fees paid on behalf of EMW.

## BACKGROUND

¶ 2. The basic facts are generally not in dispute. Smith and Kleynerman were each fifty percent shareholders in EMW. On July 31, 2010, EMW, through Smith and Kleynerman, executed a promissory note (the Note) in favor of M&I Marshall & Ilsley Bank (the Bank) in the amount of $379,093.42, plus interest (five percent plus prime, or ten percent plus prime in the event of default), payable in monthly interest-only installments beginning August 31, 2010, for a two-month period, followed by a final payment of unpaid principal and accrued interest due on October 31, 2010.[2] Under the Note, EMW also agreed to pay the Bank's legal fees and costs of collection in the event of default. The Note was the latest in a series of loan agreements that began with a Revolving Business Note in May 2003 that was amended and renewed multiple times from that time through October 2010.

¶ 3. Smith and Kleynerman were each personally liable for EMW's obligation to the Bank pursuant to continuing guarantees executed on May 6, 2003, and commercial guarantees that Smith and Kleynerman signed on or around September 10, 2009, and July 31, 2009, respectively. Additionally, Smith had pledged various stocks and certificates of deposit as collateral, and both Smith and Kleynerman mortgaged real estate to secure EMW's obligations.

---

[2] During the pendency of this case, BMO Harris Bank, N.A., purchased M&I Marshall & Ilsley Bank, and the case caption was amended to reflect the change. Our references to "the Bank" refer to the two banks interchangeably unless otherwise specified.

¶ 4. EMW eventually ceased generating revenue —the parties do not specify when—and was no longer able to make payments on its obligations to the Bank; however, for a period of time thereafter, Smith and Kleynerman made payments to the Bank on EMW's behalf by utilizing revenue from another business and from personal resources. Ultimately, Smith and Kleynerman were unable to continue paying back EMW's debt, and EMW defaulted on its payments on the Note, including the final payment due October 31, 2010. The Bank demanded payment from EMW, which it failed to make.

¶ 5. The Bank filed a complaint on March 17, 2011, asserting claims against EMW, Kleynerman, and Smith.[3] Smith hired an attorney to represent both EMW and Smith personally, and Kleynerman hired his own attorney. Smith's and EMW's attorney filed separate answers and affirmative defenses on their behalf on April 21, 2011, and Kleynerman's attorney filed an answer and affirmative defenses on August 22, 2011. Smith thereafter filed a cross-claim against Kleynerman seeking contribution, specifically alleging that "[i]f it should be determined that [Smith] is liable to [the Bank] for payment on the entirety of the loan as alleged, then [Smith] is entitled to contribution and/or indemnification from [Kleynerman]." As we will explain in more detail below, Kleynerman did not address the contribution cross-claim for nearly three years.

¶ 6. The Bank moved for summary judgment against Smith and EMW on June 11, 2012; however, it did not move for summary judgment against Kleyner-

---

[3] The complaint also listed Gigi Chan, Smith's wife, as a defendant. However, in his answer, Smith affirmatively alleged that Gigi Chan had passed away.

man at that time because Kleynerman had filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Eastern District of Wisconsin on or around February 15, 2012. During the pendency of his bankruptcy action, Kleynerman did not participate in this action.[4]

¶ 7. The Bank's summary judgment motion asserted that as of May 31, 2012, the total amount due and owing, excluding attorney's fees and costs, was $444,232.13, and including attorney's fees and costs, the total outstanding amount as of that date was $470,714.22. Smith eventually settled with the Bank. Pursuant to the terms of Smith's settlement agreement, the Bank agreed to discharge Smith's personal guaranty and Smith agreed to forfeit personal property he had pledged as collateral to secure EMW's debt, including: (1) $93,681.47 in certificates of deposit; (2) $29,323.81 in BMO Financial Group stock; (3) $76,787.54 in FIS stock; and (4) a $40,000 lien on Smith's home in Eden Prairie, Minnesota. On October 9, 2014, the trial court signed an order entering judgment in favor of the Bank against Smith personally in the amount of $239,792.82 per the stipulation.

¶ 8. As it had done with Smith, the Bank eventually settled with Kleynerman on his personal guaranty for EMW's debt. Under the terms of that settlement, the Bank released Kleynerman from his personal guaranty for EMW's debt under the Note for a total payment of $10,000, consisting of two separate $5000 payments.

---

[4] It is not clear from the record when Kleynerman's bankruptcy action was resolved; however, Smith, citing documents without reference to their location in the record, indicates that Kleynerman's bankruptcy was dismissed on or around March 27, 2013.

¶ 9. The Bank ultimately ceased participation in this case after settling with Smith and Kleynerman on their respective personal guarantees and after obtaining a judgment against EMW, by stipulation, in the amount of $329,730.46. The amount of the judgment against EMW represented the remaining balance, including interest and fees, after the payments to be made by Smith and Kleynerman pursuant to their respective settlement agreements.

¶ 10. In the interim, the parties appeared for a scheduling conference on February 19, 2014, at which time the trial court granted Kleynerman's original counsel leave to withdraw, and Kleynerman's new counsel appeared on February 25, 2014. Six months later, on August 22, 2014, Kleynerman, who had yet to respond to the cross-claim for contribution Smith had filed almost three years earlier, filed a motion seeking enlargement of time to respond to Smith's cross-claim, as well as a brief opposing default judgment on the cross-claim. The trial court denied the enlargement of time and default motions on October 9, 2014. Smith thereafter filed an amended cross-claim for contribution against Kleynerman on October 20, 2014, alleging that Smith had paid more than his fair share—"in excess of $200,000"—to discharge their common liability, whereas Kleynerman paid only $10,000. Kleynerman filed an answer and affirmative defenses denying the allegations in Smith's amended cross-claim, and they ultimately filed cross-motions for summary judgment.

¶ 11. In his summary judgment motion, Kleynerman argued that Smith was not entitled to contribution because Smith had not paid more than his fair share of EMW's debt, for which they were jointly and severally liable; that both were liable for half of EMW's debt because each held a fifty percent interest in EMW;

and that based on the total amount of EMW's outstanding debt on October 9, 2014 (which Kleynerman calculates as approximately $539,400),[5] Smith had paid less than half that amount.[6] In other words, Kleynerman argued that Smith had merely settled his own obligation with the Bank and paid nothing in excess of his own debt, and Kleynerman also highlighted that the Bank did not compromise the debt but instead took judgment against EMW for $329,730.46, the amount of the obligation remaining after factoring in Smith's and Kleynerman's settlements. Smith, to the contrary, argued that the "fair share" analysis should consider Smith's payment in relation to the total Smith and Kleynerman had paid to settle their obligations—not the total obligation EMW owed under the Note—and that Kleynerman benefitted from Smith's settlement with the Bank.

¶ 12. At the March 20, 2015 motion hearing on the cross-motions for summary judgment, the trial court, relying on its interpretation of *Boutin v. Etsell*, 110 Wis. 276, 86 N.W. 964 (1901), focused primarily on whether Kleynerman received a benefit from Smith's settlement with the Bank. The trial court ultimately concluded that Smith's settlement with the Bank had not conferred a benefit on Kleynerman, explaining that based on the evidence presented, it appeared that the

---

[5] Kleynerman's calculation is based on the sum of the judgment the Bank took against EMW, Smith's settlement payment (exclusive of the $40,000 lien Smith allowed the Bank to take on his home), and Kleynerman's settlement payment. The parties dispute whether the $40,000 lien Smith allowed the Bank to take on his home should be included in calculating Smith's total settlement payment; however, for purposes of this appeal, it is unnecessary for us to resolve this question.

[6] October 9, 2014, is the date the trial court entered judgment in favor of the Bank and against Smith and EMW.

Bank simply sought to obtain as much as possible from Smith and Kleynerman based on their respective financial standing at the time. The trial court explained:

> I think that the thing that's really gotten under Mr. Smith's skin and the thing that's the driving point of Mr. Smith's contribution claim is this supposed imbalance. And what Mr. Smith is asking me to do is balance what he paid against what Mr. Kleynerman paid.
>
> But my hunch after listening to this for as long as I have is that that's not the correct comparison to make. Because that comparison depends on the principle that the Bank is only looking to get so much out of this and it doesn't matter where it gets it from — who it gets the amount of money from if it gets to that point, like 55.3 percent.
>
> . . . .
>
> I mean, to me what [the Bank] did was they tried to get as much out of Smith, they tried to get as much out of Kleynerman, and then they quit. But it's not like they said we need to get X, and it doesn't matter how much we get from one or the other. It seems to me, in fact, if they could have gotten more out of Mr. Smith, they would have, right?

Having concluded that Smith's settlement did not confer a benefit on Kleynerman, the trial court found that Smith was not entitled to contribution. In a written order dated March 20, 2015, the trial court granted Kleynerman's motion for summary judgment and dismissed Smith's cross-claim for contribution. This appeal follows.

## ANALYSIS

¶ 13. On appeal, Smith challenges the trial court's grant of summary judgment in favor of Kleynerman and dismissal of Smith's contribution claim. For the reasons that follow, we conclude that the trial court

properly granted Kleynerman's motion to dismiss the contribution claim as it relates to the settlement payment, albeit on different grounds, but that the trial court erred in granting Kleynerman's motion in regard to Smith's claim for contribution as to attorney's fees he personally paid on behalf of EMW.

## I. Standard of Review.

¶ 14. Summary judgment is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *See* WIS. STAT. § 802.08(2) (2013–14).[7] We review the trial court's grant or denial of summary judgment *de novo,* and we apply the same standard and methodology as the trial court. *See M & I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.,* 195 Wis. 2d 485, 496–97, 536 N.W.2d 175 (Ct. App. 1995). We owe no deference to the trial court's determination, *see Walker v. Ranger Insurance Co.,* 2006 WI App 47, ¶ 6, 289 Wis. 2d 843, 711 N.W.2d 683, and we will reverse a summary judgment if the trial court incorrectly decided a legal issue or if material facts were in dispute, *see Coopman v. State Farm Fire & Casualty Co.,* 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993).

¶ 15. Where, as here, the parties have filed cross-motions for summary judgment, it is generally the equivalent of a stipulation of facts permitting the trial court to determine the case on the legal issues presented. *See Millen v. Thomas,* 201 Wis. 2d 675, 682–83, 550 N.W.2d 134 (Ct. App. 1996).

---

[7] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

## II. A party may maintain an action for equitable contribution where the parties are liable for the same obligation and one party has paid more than his or her fair share of the obligation.

¶ 16. Contribution "is a legal action to recover money paid to the use of the defendant, and stands upon the same footing as any other action founded upon an implied contract." *Bushnell v. Bushnell*, 77 Wis. 435, 438, 46 N.W. 442 (1890). A right to contribution may be based on an express contract, or, in the absence of an express contract, may "arise by operation of law to rectify an inequity resulting when a co-obligor pays more than a fair share of a common obligation." *Kafka v. Pope*, 194 Wis. 2d 234, 242, 533 N.W.2d 491 (1995). Where a claim for contribution is implied by law, the party seeking contribution must establish that: (1) the parties are liable for the same obligation; and (2) the party seeking contribution paid more than a fair share of the obligation. *Id.* at 242–43. We begin by addressing whether Smith and Kleynerman were liable for a common obligation.

### A. *Smith and Kleynerman are liable for the same obligation.*

¶ 17. On appeal, Smith argues that he and Kleynerman are liable for the same obligation based on the guarantees that they each signed in relation to EMW's debt to the Bank under the Note. We agree.

¶ 18. When a party seeks contribution from a co-obligor based on an implied contract, we first determine whether the parties are liable for the same obligation. *See id.*, 194 Wis. 2d at 243.

668

[I]n determining a right of contribution, "it matters not, in a case of a debt, whether the sureties are jointly and severally bound, or only severally; or whether their suretyship arises under the same obligation or instrument, or under divers[e] obligations or instruments, if all the instruments *are for the identical debt.*"

*Id.* (citation omitted; italics added). The reason the law implies a contract under such circumstances is because "both parties are liable for the same obligation and one has paid more than a fair share." *Id.* at 244–45. Whether the co-guarantors "signed one or two or more pieces of paper securing the same obligation is irrelevant." *Id.* at 245.

¶ 19. In *Kafka*, our supreme court addressed the question of "whether an action for contribution is available to a co-guarantor when that person has paid more than his fair share of a common obligation, even though the guaranties are evidenced by separate instruments." *Id.* at 236–37. There, Kafka was a majority shareholder and officer of Wisconsin Truck Center, Inc., and Pope was a minority shareholder and officer. *Id.* at 237. The corporation executed three promissory notes payable to M & I Northern Bank totaling $650,000, and both Kafka and Pope executed separate personal guarantees for the notes. *Id.* The personal guarantees were secured by mortgages on real property owned by Kafka and Pope. *Id.* Ultimately, the corporation was unable to meet its payments, and the bank foreclosed on two mortgages given by Kafka, the proceeds of which were applied to the principal amount the corporation owed on the notes. *Id.* At the time the bank filed its complaint, Kafka had paid $200,000 of his personal funds toward the amounts due on the notes while Pope had not paid anything. *Id.* at 237–38.

Kafka filed a complaint against Pope seeking, among other things, contribution. *Id.* at 238.

¶ 20. Pope sought summary judgment on Kafka's contribution claim, which the trial court granted. *Id.* at 239. The trial court concluded that Kafka and Pope were parties to separate contracts/guarantees with the bank, and therefore neither was entitled to seek contribution on the grounds of having paid more than his fair share. *Id.* Kafka appealed, and we reversed the trial court's ruling. *Id.* (citing *Kafka v. Pope*, 186 Wis. 2d 472, 521 N.W.2d 174 (Ct. App. 1994)). Our supreme court affirmed that decision, concluding that the trial court had erroneously granted summary judgment in favor of Pope prior to a trial on the merits. *See Kafka*, 194 Wis. 2d at 246. The supreme court reached its decision after concluding that so long as the instruments Kafka and Pope signed were for the identical debt, it was irrelevant whether Kafka and Pope were jointly and severally bound or only severally bound and that it was not necessary that both had signed the same instrument. *Id.* at 243. Having determined that Kafka was entitled to maintain the contribution action, it remanded the matter to the trial court to determine "the ultimate material question of fact as to whether [Kafka] paid more than his fair share of the common obligation." *Id.* at 246.

¶ 21. As in *Kafka*, Smith and Kleynerman both signed guarantees holding each of them personally liable for EMW's debts and obligations under the Note. Thus, because the guarantees Smith and Kleynerman signed secured the same debt—regardless of whether they signed the same document—they are liable for the same obligation. *See id.*, 194 Wis. 2d at 243–44.

¶ 22. Despite recognizing that "EMW's debt was guaranteed by both Mr. Smith and Mr. Kleynerman," the trial court nevertheless, and somewhat inexplicably, determined that Smith and Kleynerman were not liable for the same obligation, stating that the personal guarantees did not establish "that they were both related to the same obligation."[8] The trial court went on to discuss that the guarantees were not "joint personal guarantees" and that Smith's settlement payment "didn't reduce Mr. Kleynerman's [obligation]" just as "the amount Mr. Kleynerman paid didn't reduce [Smith's] obligation to the Bank either" because "[t]hose were two separate obligations that the Bank looked at separately." Not only did the trial court fail to properly apply *Kafka* in reaching these conclusions, it compounded its error by applying a "benefits conferred" analysis rather than the *Kafka* "fair share" analysis, and it therefore did not properly address whether Smith had paid more than his fair share of the obligation. We address that question in the following section.

### B. Smith did not pay more than his fair share of the obligation.

¶ 23. Where the party seeking contribution based on an implied contract establishes that the parties are liable for the same obligation, we look next to whether the party seeking contribution has paid more than his or her fair share of the obligation. *Id.* at

---

[8] As best we can tell, the trial court looked at the two settlement agreements Smith and Kleynerman each made separately with the Bank—rather than the underlying debt—as the "obligation" for the purpose of this analysis. This was error.

242–43. Here, the trial court failed to consider whether Smith paid more than his fair share of the obligation under *Kafka*. This was due to two separate errors in the trial court's analysis: first, the trial court incorrectly determined that the parties were not liable for the same obligation; and second, the trial court erred in relying upon its understanding of *Boutin* to happly a "benefits conferred" analysis rather than *Kafka*'s "fair share" analysis.[9] Because our review is *de novo,* we do so now.

¶ 24. The crux of the parties' dispute on appeal is the appropriate method for determining whether one co-guarantor has paid more than his or her fair share of the obligation. Smith, arguing that he is "entitled to contribution from Kleynerman for the settlement payment" (capitalization omitted), asserts that the appropriate analysis looks to whether one party has paid more than his or her fair share *of the total amount the parties paid to settle the matter.* In other words, Smith argues that because the parties paid approximately $250,000 total to settle with the Bank and obtain personal releases on their respective guarantees, he is entitled to contribution because he paid nearly $240,000 of that amount.[10] To the contrary, Kleynerman argues that the analysis looks to whether one party has paid more than his or her fair share *based on the total outstanding obligation.* We agree with Kleynerman that the proper analysis under these circumstances is based upon the total outstanding obligation

---

[9] Essentially, the trial court looked to whether Kleynerman received a benefit from Smith having settled with the Bank, *e.g.,* whether the Bank was willing to accept less from Kleynerman because of the amount it had received from settling with Smith.

[10] The $240,000 includes the $40,000 lien on Smith's home.

rather than the total amount paid to settle the obligation.

¶ 25. We reach this determination based on our conclusion that neither *Kafka* nor any of the other Wisconsin case law the parties rely upon specifically addresses how to determine whether one party has paid more than his or her fair share in a scenario such as this where each party negotiated a settlement and release on his own behalf, for less than half the total amount owed on the Note, without also securing a release for the co-guarantor. Our own research has likewise failed to identify Wisconsin authority directly on point. Kleynerman, however, cites to foreign authority such as *Falb v. Frankel*, 73 A.D.2d 930 (N.Y. App. Div. 1980), *Sacks v. Tavss*, 375 S.E.2d 719 (Va. 1989), and *Humphrey v. O'Connor*, 940 P.2d 1015 (Colo. App. Ct. 1996), that supports his position. In light of the *Kafka* test, we find these, and other foreign cases, persuasive.

¶ 26. We first consider *Thomas v. Jacobs*, 751 A.2d 732 (R.I. 2000), a factually similar case to the one at hand, in which the Supreme Court of Rhode Island addressed the issue before us: "whether plaintiff is entitled to contribution from his co-guarantor when plaintiff has paid less than half the total amount owed and has secured a release in his name alone." *See id.* at 734. In Rhode Island, as in Wisconsin, "[t]he doctrine of equitable contribution is applied to prevent one of two or more guarantors from being obliged to pay more than his or her fair share of a common burden, or to prevent one guarantor from being unjustly enriched at the expense of another." *See id.*

¶ 27. In *Thomas*, the plaintiff (Thomas) and defendant (Jacobs) each owned fifty percent of Protech Leather Apparel, Inc. (Protech). *Id.* at 733. Protech borrowed one million dollars from the bank and

Thomas and Jacobs were jointly and severally liable, each having executed a personal guaranty. *Id.* When Protech defaulted, the bank liquidated its assets, and after applying the proceeds to the outstanding debt, the remaining indebtedness on the loans was approximately $744,000. *Id.* Thomas negotiated a settlement agreement with the bank wherein he paid $100,000 in cash and granted the bank a $75,000 mortgage on his residence in full satisfaction of his personal obligation. *Id.* Thomas's settlement with the bank did not relieve Jacobs or any other party from liability. *Id.* Like Thomas, Jacobs also reached a settlement agreement with the bank. *Id.* In exchange for a release from his personal guaranty, Jacobs agreed to grant the bank a $75,000 mortgage on his residence. *Id.* Jacobs' agreement with the bank did not release any party but Jacobs from liability. *Id.*

¶ 28. After the parties reached their respective settlement agreements with the bank, Thomas sought contribution from Jacobs, arguing that "he was entitled to contribution from [Jacobs] because [Thomas] had paid more than half the parties' combined settlement amount of $250,000." *Id.* at 734. The Supreme Court of Rhode Island disagreed, concluding that Thomas's argument—that the fair share calculation should be based on his and Jacobs' total settlement amount of $250,000—was "based on a faulty premise" because "[t]he total amount owed was in excess of $700,000–[Thomas's] share of which would amount to more than $350,000." *Id.* Thus, the court concluded that Thomas's "payment of $175,000 . . . was not more than the amount that [Thomas] legally was obligated to pay." *Id.* The court further noted that neither party, in settling with the bank and obtaining a release from liability, obtained a release for any *other* party. *See id.*

Because each party obtained a release only for himself and not for any other co-guarantor, the court determined that "a guarantor who is able to secure such a release has essentially renegotiated his share of the amount owed" and concluded that neither party was entitled to contribution because neither had "paid more than half the outstanding debt of more than $700,000." *Id.*

¶ 29. Similarly, the Minnesota appellate court recently explained in *Kroona v. Dunbar*, 868 N.W.2d 728 (Minn. Ct. App. 2015), that the fair share calculation looks to the amount of the outstanding obligation. *See id.* at 735–37. In Minnesota, as in Wisconsin, " '[c]ontribution requires, first, a common liability of two or more actors to the injured party, and second, payment by one of the actors of more than its fair share of the common liability.' " *See id.* at 733 (citation omitted).

¶ 30. In *Kroona,* a limited liability company with four owners purchased land using approximately $5.2 million secured by a loan agreement from the bank. *Id.* at 730–31. The owners "executed four separate but essentially identical limited guaranty agreements, in which each individual guarantor guaranteed [the LLC's] obligations under the loan agreement up to $1,575,000." *Id.* at 731 (footnote omitted). The LLC defaulted, and after a foreclosure sale, the remaining indebtedness to the bank was $1,547,608.15. *Id.* Some of the guarantors settled with the bank and paid a total of $150,000 in exchange for their releases from liability. *Id.* Later, the bank took judgment in the amount of $1,547,608.15 against the guarantors who had not been part of the $150,000 settlement and release. *Id.* at 731–32. After the $1,547,608.15 judgment was entered, the respondent settled with the bank for $400,000 and thereafter sought contribution from the other co-guarantors. *Id.* at 732.

¶ 31. On appeal, the appellants—the co-guarantors who had obtained a settlement and releases for $150,000—argued that the parties did not share a common liability because they had signed separate guarantees. *Id.* at 733. The court rejected that argument and concluded that the parties "were bound for the performance of the same duty by the same principal" and therefore "share[d] a common liability even though they signed separate guaranties." *Id.* Next, the court considered the appropriate method for determining whether a party has paid more than his or her fair share of a common liability and determined that "the common liability stems from the loan guaranties, under which the guarantors are liable for the unpaid balance of the loan, plus interest and costs." *See id.* at 735. Ultimately, the court concluded that the fair share calculation is based upon the number of available co-guarantors and the aggregate liability. *Id.* at 736–37.[11]

¶ 32. As can be seen from *Thomas* and *Kroona*, where co-guarantors are liable for the same obligation and one party seeks contribution based on the argument that he or she has paid more than his or her fair share of the common obligation, courts in other jurisdictions have rejected the argument Smith presents here and have instead concluded that the fair share calculation is based on the total amount of the outstanding obligation. *See Thomas*, 751 A.2d at 734, and *Kroona*, 868 N.W.2d at 736–37; *see also Falb*, 73 A.D.2d at 931 ("[a] part payment which does not exceed a surety's pro rata share of the indebtedness does not

---

[11] The court remanded the matter to the trial court to determine the proper number of co-guarantors to include in the fair share calculation, as there remained a question of fact regarding the solvency of some of the co-guarantors. *See Kroona v. Dunbar*, 868 N.W.2d 728, 736–37 (Minn. Ct. App. 2015).

entitle him to contribution from his cosurety," and where "each of two cosureties compromises his own liability for less than one half of the original debt owed to the common creditor but for different amounts, the law gives no right of contribution to the surety paying the greater sum because he merely settled his own obligation and paid nothing in excess of his own debt."); *Sacks*, 375 S.E.2d at 722 ("[u]nless one surety pays more than his proportionate share of the amount owed the creditor or pays less yet secures a release for his cosurety, he has done no more than he was obligated to do in the first place.").

¶ 33. We find the conclusions in these foreign cases convincing. First, the requirements for contribution in the cited jurisdictions—a shared common liability and a co-guarantor's payment of more than his or her fair share of the common liability—are the same requirements set forth in *Kafka*. Second, as in this case, the cited foreign cases either addressed scenarios in which the party seeking contribution argued, as Smith does here, that the "fair share" calculation should be based upon the total settlement amount rather than the total outstanding indebtedness, or addressed scenarios where, as here, the co-guarantors negotiated separate settlements with the creditor for less than half of the outstanding total debt and obtained personal releases for himself only. For those reasons, we likewise conclude that where two or more parties are liable for the same obligation and each party obtains a settlement and release only on his or her own behalf, the fair share calculation is based on the total amount of the outstanding obligation.[12]

---

[12] In a footnote, the Supreme Court of Rhode Island recognized an exception that allows a co-guarantor to seek

¶ 34. Next, the parties dispute the meaning of "fair share." Kleynerman argues that it means "proportionate," whereas Smith argues that "[a] properly stated claim for contribution . . . requires only that a party has paid more than his fair share of a common obligation" and that it is not necessary that he "paid more than a mathematically precise pro rata share." He does not, however, precisely articulate what he understands "fair share" to mean.

¶ 35. We need devote little time to this issue, as we readily conclude that "fair share" means equitable or proportionate. First, Black's Law Dictionary defines the word "fair" as meaning, among other things, "just" and "equitable." *Fair*, BLACK'S LAW DICTIONARY (10th ed. 2010). Second, in *Michel v. McKenna*, 199 Wis. 608, 614, 227 N.W. 396 (1929), our supreme court stated that "[i]t is only when joint tort-feasors 'have been subjected to an established common liability, and one has paid more than his *equitable share* of such common obligation, that the right to contribution arises.' " *Id.* at 614 (citation omitted; italics added). Although the court was referring to contribution in the context of joint tortfeasors, we see no reason that the language referring to an "equitable share" should not apply here. Accordingly, a party has paid more than his or her fair share under *Kafka* when he or she has paid more than an equitable or proportionate share.

---

contribution where he or she has paid less than his or her fair share of the debt: contribution among co-guarantors may be had "when one co-guarantor has paid less than his or her fair share of the debt *and has secured a full release from the creditor for any other co-guarantor(s)." Thomas v. Jacobs*, 751 A.2d 732, 734, n.1 (R.I. 2000) (italics added). Here, it is undisputed that Smith obtained a release only for himself.

¶ 36. Here, Smith and Kleynerman were fifty per-
cent shareholders in EMW, and they were the only two
parties who signed guarantees for the obligation at
issue. Therefore, in this case, to pay more than one's fair
share can only mean payment exceeding fifty percent.
Smith and Kleynerman do not dispute that the total
debt owed under the Note at the time the parties
resolved this matter with the Bank well-exceeded
$500,000. It is undisputed, however, that Smith, includ-
ing the $40,000 lien on his home, paid only $239,792.82,
which is less than half of the total amount that was
ultimately owed on the Note. Accordingly, as a matter of
law, Smith cannot establish that he paid more than his
fair share of the obligation, and his claim for contribu-
tion as it relates to the settlement payment necessarily
fails.

¶ 37. Based on the foregoing, we affirm that
portion of the trial court's grant of Kleynerman's
summary judgment motion as it relates to Smith's
claim for contribution on the amount paid to settle the
matter with the Bank, albeit on different grounds. *See
International Flavors & Fragrances, Inc. v. Valley
Forge Ins. Co.*, 2007 WI App 187, ¶ 23, 304 Wis. 2d
732, 738 N.W.2d 159 (appellate court may affirm
summary judgment on different grounds than those
relied on by the trial court).

### III. The trial court erred in dismissing Smith's contribution claim as it relates to attorney's fees.

¶ 38. Our conclusion that Smith is not entitled to
contribution on the amount paid to settle with the

Bank and obtain his personal release does not fully resolve this matter, as Smith also argues on appeal that he is entitled to contribution from Kleynerman for attorney's fees Smith personally paid to hire an attorney to represent EMW. Upon review, we agree that the trial court erred in granting Kleynerman's summary judgment motion in regard to Smith's claim for contribution to the extent it relates to the attorney's fees issue.

¶ 39. The trial court's discussion of the attorney's fees aspect of Smith's contribution claim was cursory at best, and to the extent the trial court even considered the matter, it focused on whether Kleynerman had personally received a benefit as a result of Smith's personal representation. Smith's argument, however, is not that he is entitled to contribution for attorney's fees Smith paid on his own behalf; rather, Smith argues he is entitled to contribution from Kleynerman for attorney's fees Smith paid *on behalf of EMW* in this matter. Because the trial court failed to properly consider this question, and because the parties fail to direct our attention to anything in the record related to the attorney's fees issue—such as the amount of fees Smith paid on behalf of EMW, the amount or type of work EMW's attorney performed on its behalf, or whether there was any type of agreement between Smith and Kleynerman, for example—we conclude that reversal is appropriate as to this aspect of Smith's contribution claim.

¶ 40. In light of the parties' arguments on appeal, we briefly address the test the trial court is to apply on remand. Smith argues he is entitled to contribution from Kleynerman for attorney's fees he paid on behalf of EMW based on *Boutin*. There, the court concluded a group of sureties (the plaintiffs)

could seek attorney's fees from a co-surety (the defendant) because it appeared "that the plaintiffs acted as prudent men would have acted under the circumstances, and that such action resulted in a substantial benefit to all of the sureties," as well as that "there is no good reason for saying that, in actions of this kind, reasonable attorney's fees, prudently incurred for the common benefit of the sureties, may not be recovered." *Id.*, 110 Wis. at 279–80. In response, Kleynerman argues that Wɪs. Sᴛᴀᴛ. § 183.0502(1) prevents Smith from seeking contribution for attorney's fees paid on behalf of EMW.

¶ 41. We conclude that Smith's reliance on *Boutin* is misplaced, as that case is distinguishable. Under *Boutin*, a co-guarantor may seek contribution for reasonable attorney's fees and expenses "incurred for the common benefit of the sureties." *Id.*, 110 Wis. at 280. The facts of this case differ, however, because Smith seeks contribution for attorney's fees and expenses he paid out of his own pocket *on behalf of EMW,* whereas the *Boutin* plaintiffs sought contribution for attorney's fees they paid *on behalf of the group of sureties. See id.* at 279–80.

¶ 42. We likewise conclude that Kleynerman's reliance on Wɪs. Sᴛᴀᴛ. § 183.0502(1) is misplaced. Section 183.0502(1) states: "An obligation of a member to provide cash or property or to perform services *as a contribution to a limited liability company* is not enforceable unless specified in a writing signed by the member." (Italics added.) Here, it is Smith—not the limited liability company—who is seeking contribution for attorney's fees and expenses that Smith paid on behalf of EMW. Section 183.0502(1) requires only that a member's obligation to provide funds *to the limited liability company* be in writing. *See id.* We are there-

681

fore satisfied that § 183.0502(1) does not prevent Smith from seeking contribution for attorney's fees under these circumstances.

¶ 43. Accordingly, on remand, the trial court is to conduct further proceedings to determine whether, based on the *Kafka* test, either party is entitled to summary judgment on Smith's claim for contribution for attorney's fees Smith paid solely on behalf of EMW.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.