COURT OF APPEALS
DECISION
DATED AND FILED

August 27, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2018AP937**

Cir. Ct. No.  **2015CV5887**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

DALE CHAPP, INDIVIDUALLY AND
AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF RUTH CHAPP, DECEASED,

PLAINTIFF-APPELLANT,

V.

COLGATE-PALMOLIVE COMPANY,

DEFENDANT-RESPONDENT,

AND IMERYS TALC AMERICA, INC.,

DEFENDANT.

APPEAL from an order of the circuit court for Milwaukee County: WILLIAM SOSNAY, Judge. *Affirmed*

Before Kessler, Kloppenburg and Dugan, JJ.

¶1 DUGAN, J. Dale Chapp, individually and as the personal representative of the Estate of Ruth Chapp, deceased, appeals from the trial court's order granting summary judgment to Colgate-Palmolive Company, the manufacturer of Cashmere Bouquet talcum powder, dismissing Chapp's claims against it.[1]

¶2 This action arises from Chapp's claim that his wife, Ruth Chapp, was directly exposed to inhalable asbestos from her daily use of "asbestos containing" Cashmere Bouquet talcum powder from 1969 to the mid-1980's and that this asbestos exposure was a contributing cause of Ruth's[2] death due to mesothelioma, a type of cancer associated with exposure to asbestos.

¶3 Chapp acknowledges that his occupation and projects resulted in Ruth's exposure to asbestos fibers. Chapp states that Ruth was regularly exposed to inhalable asbestos from the products and/or machinery that he worked with and around when she shook out and laundered his work clothes.[3] He also alleges that Ruth was exposed to inhalable asbestos because she used Colgate's Cashmere

---

[1] Imerys Talc America, Inc. and Cyprus Amax Minerals Company were also named as defendants in Chapp's complaint. Each filed a motion for summary judgment, as did Colgate. Imerys filed for bankruptcy on February 13, 2019, in the United States Bankruptcy Court for the District of Delaware and, therefore, as to Imerys, that appeal is stayed pending the outcome of that bankruptcy proceeding. The trial court also granted summary judgment in favor of Cyprus Amax based on the court's determination that Cyprus Amax had established that it did not assume the liabilities of any company that sold the talc at issue in this case. Chapp does not appeal that ruling and Cyprus Amax will not be further mentioned in this opinion.

[2] In this opinion, for clarity, we refer to Chapp's wife by her given name.

[3] Initially, Chapp's complaint included allegations against his former employer that used welding rods and equipment that contained asbestos; and several sellers, manufacturers, or distributors of products designed to include asbestos such as asbestos containing clutches, joint compounds, brakes, welding rods, and welding equipment. Those claims are no longer part of this action.

Bouquet talc powder that contained asbestos, at least once a day for approximately nine years.

¶4 Chapp alleges the following claims against Colgate: (1) strict liability defective design; (2) strict liability unreasonably dangerous products; (3) negligence; (4) negligence *per se*; and (5) punitive damages.

¶5 The trial court granted Colgate's motion for summary judgment because it concluded, as a matter of law, that Chapp had "not shown more than the mere possibility of causation," which was insufficient to overcome the summary judgment motion. The trial court determined Chapp's submissions could only show that *some* of the Cashmere Bouquet used by Ruth *could have* contained asbestos. It concluded that because, at best, liability and non-liability were evenly balanced, the jury could only find causation by speculation and conjecture, which would be improper.

¶6 Chapp argues that the trial court erred as a matter of law when it granted summary judgment to Colgate on the issue of causation because it failed to view the evidence in a light most favorable to Chapp and to draw all reasonable inferences in his favor. We disagree and, therefore, affirm.

**BACKGROUND**

*Colgate and Cashmere Bouquet*

¶7 Colgate manufactured, marketed, and sold Cashmere Bouquet talcum powder from 1871 to 1995. Cashmere Bouquet talcum powder contained cosmetic grade talc, small amounts of perfume, and anti-caking and anti-bacterial agents. The talcum powder was in a soft pink oval container labeled "Cashmere

Bouquet" with a "shaker top." Cashmere Bouquet was never formulated to contain asbestos.

*Ruth's use of Cashmere Bouquet*

¶8 Beginning in 1969 through approximately 1985, Ruth used Cashmere Bouquet at least every day after she showered. She used additional Cashmere Bouquet when she was warm or anticipated that she would perspire. Ruth switched to different brands of talcum powder in approximately 1985.

¶9 In August 2013, Ruth began experiencing extreme fatigue and lower abdominal pain. She was diagnosed with malignant peritoneal mesothelioma, a type of mesothelioma that affects abdominal tissue. The diagnosis was subsequently confirmed by a pathology examination. Ruth died on September 21, 2013.

¶10 Chapp does not have any Cashmere Bouquet product that Ruth actually used and he does not know of anyone who possesses Cashmere Bouquet that is identical to the product Ruth used. Consequently, the actual product that Ruth used has not been tested for asbestos.

*Talc and asbestos*

¶11 Talc is a mineral that is found in talc deposits in mines. Cosmetic and pharmaceutical grade talcs are the purest forms of talc. Talc itself is not asbestos. Non-talc minerals can be present in a talc deposit in a mine. Those minerals are often referred to as "accessory minerals." If asbestos were present in talc, it would be considered an accessory mineral.

¶12    Asbestos is a term for the following six regulated, naturally occurring, highly fibrous silicate minerals:    (1) chrysotile; (2) crocidolite; (3) amosite; (4) tremolite asbestos; (5) anthrophyllite asbestos; and (6) actinolite asbestos.    These regulated minerals are included in two different mineral families—serpentine and amphibole.    Serpentine and amphibole minerals can crystalize in a rather common non-asbestiform habit that is not regulated as asbestos.[4]  However, they also can crystalize in a relatively rare asbestiform habit that is regulated as asbestos.  Chrysotile is the only regulated asbestiform mineral that is in the serpentine family.  The other five regulated asbestiform minerals are in the amphibole family.

*Scientific testing of talc and talc products for asbestos contamination*

¶13    In the time period relevant to this action, Colgate obtained the talc it used in Cashmere Bouquet from three sources—mines in Italy, North Carolina, and Montana.  Chapp alleges that the mines from which Colgate obtained the talc contained asbestos during the years Ruth was allegedly exposed to asbestos.

¶14    The trial court summarized Chapp's allegations regarding asbestos found in samples of talc from the mines.[5]  The summary included findings by

---

[4] "Habit" is used in mineralogy to describe the shape of either a single crystal or aggregates of crystals.

[5] The trial court excluded some of Chapp's evidence because Chapp removed two of his experts, Ronald Gordon and Sean Fitzgerald, from his expert witness list.  It stated that Chapp could only rely on admissible evidence in support of his motion for summary judgment and because Gordon and Fitzgerald were no longer witnesses their expert reports were hearsay and were not admissible.  Thus, it excluded their expert reports and disregarded the reports when it granted Colgate's motion for summary judgment.  On appeal, Chapp does not challenge the trial court's ruling.

various studies and entities that reported finding asbestos in some samples of talc taken from the mines, particularly the mines in Italy between 1968 and 1979. The trial court also cited to other studies reporting that the Italian mines were also tested throughout the same time frame and found not to contain asbestos. It commented that the Italian talc mines were still open and producing cosmetic talc "today." As to the North Carolina and Montana talc mines, the trial court stated that Chapp provided evidence of asbestos contamination via Colgate's internal testing and research. Colgate disagreed, alleging that "'[t]he only tests of the [North Carolina] mine reported in the scientific literature found its talc to be asbestos-free' and that the 'talc from Montana does not contain asbestos forming minerals.'"

¶15    Chapp also alleged that Cashmere Bouquet was tested and found to contain asbestos during the years Ruth was allegedly exposed to asbestos in Cashmere Bouquet. The trial court summarized Chapp's evidence that certain samples of Cashmere Bouquet were tested and analyzed and found to contain asbestos. In 1968, the Johns Manville Research and Engineering Center[6] tested eleven brands of talcum powder for fibrous components and found a trace of asbestos in the Cashmere Bouquet sample. In 1973, Dr. Alfred Weissler of the federal Food and Drug Administration (FDA) summarized New York University Professor Seymour Z. Lewin's analytical results for asbestos in talc. Professor Lewin analyzed 195 samples of talc from various companies, including two samples of Cashmere Bouquet. He found that one Cashmere Bouquet sample

---

[6] Johns Manville is the United States' largest producer of chrysotile asbestos products. We refer to this company by its current name in this opinion.

contained 8% chrysotile, but he could not determine if there was any chrysotile in the second sample.

¶16 Periodically, Walter C. McCrone Associates, Inc. tested talcum powder for asbestos as an outside laboratory for Colgate. In 1974, McCrone reported to Colgate that it found chrysotile in the samples of Cashmere Bouquet it had tested. In March 1976, Colgate received a report from the Mount Sinai School of Medicine that its testing of a Cashmere Bouquet sample showed "high asbestos." In 1984, McCrone informed Colgate that its testing of six samples of "finished products"[7] showed that chrysotile asbestos was present in three samples.

¶17 The record reflects that Colgate's expert, Matthew Sanchez, Ph.D., challenged all of the contemporaneous, historical reports, both published and unpublished, concerning the testing for asbestos of talc sourced for use in Cashmere Bouquet talcum powder. He stated that those reports are based on novel methodologies that are neither generally accepted nor considered reliable today for identifying and quantifying any asbestos in talc and talcum powder.

¶18 The summary above reflects that Chapp and Colgate have introduced conflicting evidence regarding the issues of (1) whether the mines from which Colgate obtained its talc contained asbestos, and (2) whether Cashmere Bouquet contained asbestos during the period of time that Ruth was allegedly exposed to asbestos from Cashmere Bouquet. We discuss below how that conflicting evidence affects Colgate's motion for summary judgment.

---

[7] The record does not disclose whether Cashmere Bouquet was one of the "finished products" that McCrone tested for asbestos.

*Medical evidence regarding mesothelioma and asbestos*

¶19    Malignant mesothelioma is a tumor associated with inhalation exposure to asbestos fibers. The latency period between exposure and diagnosis typically ranges from twenty to forty years.

¶20    In her expert report, one of Chapp's expert medical witnesses, Jacqueline Moline, M.D., a specialist in occupational and environmental diseases, stated that "[a]sbestos exposure is the only known occupational and/or environmental cause of mesothelioma in North America." She also opined that Ruth suffered and died from rapidly progressive malignant mesothelioma. In her report she stated that "[a]ssuming that the above information is correct, [Ruth's] mesothelioma was a result of her exposure to asbestos."

¶21    Chapp's other expert medical witness, Richard Kradin, M.D., a pulmonary pathologist, stated that "[it is] generally accepted in the medical community that asbestos causes mesothelioma and the great majority of mesotheliomas are caused by asbestos." Dr. Kradin also stated that Ruth was exposed to asbestos over many years in two ways—laundering her husband's work clothes and applying talcum powder that more probably than not was contaminated with asbestos. He further opined that those exposures were the contributory sources of Ruth's mesothelioma and her death.[8]

---

[8] Colgate argues that Chapp cannot meet his burden of proof to establish that Ruth's exposure to Cashmere Bouquet specifically was a substantial cause of her development of mesothelioma, as opposed to her admitted exposure to asbestos from numerous other products that were intentionally designed to contain asbestos. Because we conclude that Chapp has not presented sufficient evidence that the Cashmere Bouquet that Ruth used contained asbestos, we need not address Colgate's argument.

## STANDARD OF REVIEW

¶22 Chapp argues that the trial court erred in granting summary judgment because he presented evidence from which the jury could reasonably infer that some of the Cashmere Bouquet that Ruth used was contaminated with asbestos.[9] Colgate argues that, even if fully credited, Chapp's evidence merely shows possible asbestos contamination in some Cashmere Bouquet, which is insufficient as a matter of law to support a reasonable inference that the Cashmere Bouquet used by Ruth was tainted.

¶23 We review a grant of summary judgment *de novo*, using the same methodology as the trial court, but benefiting from its analysis. *See **Eichenseer v. Madison-Dane Cty. Tavern League, Inc.**, 2008 WI 38, ¶30, 308 Wis. 2d 684, 748 N.W.2d 154. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2017-18).[10] Affidavits in support of and in opposition to a motion for summary judgment "shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3).

¶24 Furthermore, "[w]e owe no deference to the trial court's determination, and we will reverse a summary judgment if the trial court

---

[9] Chapp also argues that he presented sufficient evidence that Ruth's exposure to asbestos from Cashmere Bouquet was a "substantial factor" in her development of mesothelioma. Because we conclude that Chapp has not presented sufficient evidence that the Cashmere Bouquet that Ruth used was contaminated with asbestos, we need not address the issue.

[10] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

incorrectly decided a legal issue or if material facts were in dispute[.]" *See BMO Harris Bank, N.A. v. European Motor Works*, 2016 WI App 91, ¶14, 372 Wis. 2d 656, 889 N.W.2d 165 (internal citation omitted). "We examine the moving party's submissions to determine whether they constitute a prima facie case for summary judgment. If they do, then we examine the opposing party's submissions to determine whether there are material facts in dispute that entitle the opposing party to a trial." *See Palisades Collection LLC v. Kalal*, 2010 WI App 38, ¶9, 324 Wis. 2d 180, 781 N.W.2d 503 (internal citation omitted). The moving party "need only make a prima facie showing that the evidence would be admissible at trial. If admissibility is challenged, the [trial] court must then determine whether the evidence would be admissible at trial." *Id.*, ¶10 (internal citation omitted).

¶25 "In determining whether material facts are at issue, we must ask whether 'only one reasonable inference may be drawn from the undisputed facts.'" *See Zielinski v. A.P. Green Indus., Inc.*, 2003 WI App 85, ¶7, 263 Wis. 2d 294, 661 N.W.2d 491 (citation omitted). "If so, 'the drawing of that inference is a question of law, and an appellate court may draw it.'" *Id.* (citation omitted). If, however, our "review of the record reveals that disputed material facts exist or undisputed material facts exist from which reasonable alternative inferences may be drawn, then summary judgment is inappropriate." *See id.*

¶26 With respect to causation and summary judgment, our supreme court has held:

> The test of cause in Wisconsin is whether the defendant's negligence was a substantial factor in contributing to the result. The phrase "substantial factor" denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.

> Causation is a fact; the existence of causation frequently is an inference to be drawn from the circumstances by the trier of fact.
>
> ....
>
> *[If] there is no credible evidence upon which the trier of fact can base a reasoned choice between ... two possible inferences, any finding of causation would be in the realm of speculation and conjecture. "Speculation and conjecture apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made." "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."*

*Id.*, ¶16 (citing *Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 458-59, 460, 267 N.W.2d 652 (1978); ellipses in *Merco Distrib. Corp.*; emphasis added.)

## DISCUSSION

¶27    The issue in this case is whether Chapp has presented credible evidence from which a reasonable person could infer that Ruth was exposed to asbestos when she used Cashmere Bouquet, or whether he has presented evidence that Ruth's exposure to asbestos in Cashmere Bouquet is only a possibility. Construing the evidence in a light most favorable to Chapp, we conclude that, at best, he has presented evidence that it is possible that Ruth was exposed to asbestos in Cashmere Bouquet. Chapp's evidence is not sufficient to permit a reasoned choice between alternative findings, one leading to liability and the other not. Because any finding regarding Colgate's liability or the lack of liability would be based on speculation, we uphold the trial court's summary judgment order.

¶28    As the trial court noted, there is no direct evidence that the Cashmere Bouquet used by Ruth contained asbestos, but Chapp has produced circumstantial evidence indicating that asbestos was found in some mines that supplied talc to Colgate and in some samples of Cashmere Bouquet. "Circumstantial evidence is not necessarily better or worse than direct evidence. Either type of evidence can prove a fact." WIS JI—CIVIL 230. However, here Chapp's evidence only makes it possible to conclude that the Cashmere Bouquet used by Ruth included some asbestos. *See Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 458-61, 267 N.W.2d 652 (1978) (overturning a jury verdict on the issue of causation in a negligence action against a company that provided burglary alarm services to a client whose property was burglarized because the record failed to remove the issue of causation from the realm of speculation; the cause of the client's loss could be attributed to a condition to which no liability attaches or to one for which liability attaches).

¶29    To infer links between Ruth's mesothelioma and the Cashmere Bouquet produced by Colgate would require piling one possibility on top of another possibility. Specifically, it would require the possibility that Colgate's suppliers supplied Colgate with talc containing asbestos, followed by the possibility that Colgate filled containers of Cashmere Bouquet with talc containing asbestos, and followed by the possibility that Ruth purchased and used containers of Cashmere Bouquet that contained the tainted talc. *See Risse v. Building Serv. Indus. Supply*, No. 2011AP1415, unpublished slip op. ¶26 (WI App July 3, 2012). Based on the facts and circumstances in the record in this case, we conclude that, at best, Chapp has presented evidence that it is possible that Ruth was exposed to asbestos in Cashmere Bouquet.

¶30    Although we are mindful that each case depends on the totality of the circumstances in that case, *see Zielinski*, 263 Wis. 2d 294, ¶18, we conclude Chapp's case presents a situation that is similar to those that were presented in *Miller v. American Art Clay Co. Inc.*, 28 F. Supp. 3d 825 (W.D. Wis. 2014), and *Risse v. Building Service Industries Supply*, No. 2011AP1415, unpublished slip op. (WI App July 3, 2012).[11]    *Miller* involved claims arising from the death due to mesothelioma of an artist, Don Peter Miller, who worked with clay. *Id.*, 28 F. Supp. 3d at 826.    Miller's wife and daughter brought a lawsuit against American Art Clay, a clay manufacturer, and R.T. Vanderbilt Co., Inc., a supplier of talc that American used in some of its clay. *Id.* at 826-27.    The plaintiffs alleged that Vanderbilt's talc contained asbestos and that Miller used American's White Clay No. 25 which contained that talc. *Id.*    Miller was also exposed to other sources of asbestos. *Id.* at 827.

¶31    The federal district court granted the defendants' summary judgment motions concluding that the plaintiffs did not have sufficient evidence to show that Miller had used White Clay No. 25. *Id.* at 829.    Miller had not been deposed before he died and the only evidence about the clay he used was the testimony of the plaintiffs, who recalled that Miller used white or light gray American clay. *Id.* at 827.    Their description of the clay matched those of multiple American clays—

---

[11] The decision in *Miller v. American Art Clay Co.*, 28 F. Supp. 3d 825 (W.D. Wis. 2014) interpreting Wisconsin case law is persuasive but not precedential authority. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶23, 283 Wis. 2d 555, 699 N.W.2d 205.    We rely on *Miller* because of the similarity of the relevant facts and its astute analysis.

Furthermore, we do not cite *Riese v. Building Service Industries Supply*, No. 2011AP1415, unpublished slip op. (WI App July 3, 2012) as authority, but are persuaded by its reasoning. *See* WIS. STAT. RULE 809.23(3) (allowing the citation of unpublished opinions issued on or after July 1, 2009 for persuasive value).

including some that did not contain any talc. *Id.* at 827, 831. Applying *Zielinski*, 263 Wis. 2d 294, ¶16, the federal district court concluded that because the description of the clay included American clay that contained no talc, the jury would be forced to speculate regarding whether American and Vanderbilt were the source of the asbestos that caused Miller's mesothelioma. *See Miller*, 28 F. Supp. 3d at 826, 831. Here, as in *Miller*, the jury would be forced to speculate as to whether any Cashmere Bouquet used by Ruth contained asbestos tainted talc.

¶32     In *Risse*, we upheld an order of the trial court granting summary judgment that dismissed products liability claims against a contractor, L & S Insulation Company, and its supplier arising out of the death of Loren Risse caused by mesothelioma. *See id.*, No. 2011AP1415, ¶¶23, 27. For approximately forty years, Risse worked in construction as a carpenter at over fifty job sites. *Id.*, ¶2. Insulation contractors installing asbestos and fiberglass insulation were also present when Risse was working. *Id.* Risse estimated that L & S was present at 20% of the job sites where he worked. *Id.*, ¶20.

¶33     We held that the evidence was insufficient to create a factual basis for an inference that L & S's asbestos was ever at the same job site as Risse. *See id.*, ¶23. We also held that the business relationship between the supplier and L & S was insufficient to establish more than a possibility that Risse was exposed to asbestos because the supplier also furnished non-asbestos containing products, and L & S primarily used fiberglass in its insulation work. *See id.*, ¶27.

¶34     Here, there is evidence that some containers of Cashmere Bouquet contained asbestos. But there is also evidence that other containers of Cashmere Bouquet did not contain asbestos. As in *Risse*, this court concludes that there is

insufficient evidence to create a factual basis for the inference that Ruth ever purchased or used any Cashmere Bouquet containing asbestos. Any such inference would be based on pure speculation or conjecture.

¶35 Chapp argues that ***Lambrecht v. Estate of Kaczmarczyk***, 2001 WI 25, ¶¶81, 85, 241 Wis. 2d 804, 623 N.W.2d 751, demonstrates the proper approach in a case in which conflicting reasonable inferences may be drawn from the summary judgment record. He asserts that, "[i]f the evidence might reasonably lead to either of two inferences it is for the jury to choose between them." *See **id**.* However, as we stated above:

> *"Speculation and conjecture apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made." "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."*

***Zielinski***, 263 Wis. 2d 294, ¶16 (emphasis added, citations omitted). We agree with the trial court's conclusion that the probabilities that Ruth used Cashmere Bouquet that contained asbestos or that she only used Cashmere Bouquet free of asbestos are at best evenly balanced.

¶36 Chapp also relies on ***Zielinski*** and ***Horak v. Building Services Industry Sales Co.***, 2008 WI App 56, 309 Wis. 2d 188, 750 N.W.2d 512. He argues that the circumstantial evidence that Ruth was exposed to asbestos in Cashmere Bouquet is at least as compelling as the evidence that the decedents in those cases were exposed to the defendants' asbestos containing products in those cases. We disagree.

15

¶37 The record in *Zelinski* established that George Zelinski did the type of work that used asbestos and that Zelinski's employer "probably bought" asbestos from the defendant. *Id.*, 263 Wis. 2d 294, ¶¶19, 20. Therefore, a factfinder might infer that Zelinski used this product in his work. *Id.* In *Horak*, the record showed that George Benzinger did the type of work that used asbestos and that during the period of time in question Benzinger's employer or its predecessor bought asbestos from the defendant. *Id.*, 309 Wis. 2d 188, ¶14. Therefore, a reasonable jury could infer that Benzinger used the defendant's asbestos in his work. *Id.* Unlike the instant case, *Zelinski* and *Horak involved products that were known to contain asbestos*. Here, at best, Chapp has presented circumstantial evidence that it is possible that Ruth was exposed to asbestos in Cashmere Bouquet. Chapp's evidence is not sufficient to permit a reasoned choice between alternative findings, one leading to liability and the other not. Any finding regarding Colgate's liability or the lack of liability would be based on speculation.

¶38 Finally, Chapp argues that the inference that Ruth was exposed to asbestos from her use of Cashmere Bouquet is supported by the affidavit testimony of Dr. Jacqueline Moline, his expert in occupational and environmental disease. He states that Dr. Moline cited an article authored by Gordon and Fitzgerald that reported that testing established that ordinary use of Cashmere Bouquet would cause asbestos to enter the breathing zone of the user in amounts far in excess of background levels and higher than the current permissible exposure level recognized by OSHA (the federal Occupational Safety and Health Administration). Chapp then states that Dr. Moline expressed the opinion, to a reasonable degree of medical certainty, that Ruth's exposure to "asbestos-containing" talcum powder and exposure to her husband's "asbestos-containing"

clothes led to the development of her mesolthelioma. Chapp also relies on the opinion of Dr. Richard Kradin that Ruth had asbestos exposure from two sources—one her husband's work clothing and "secondly by the application over many years of the talcum powder product that was contaminated more probably than not by asbestos."

¶39    In response, Colgate argues that Dr. Moline and Dr. Kradin are medical experts—they are not experts in testing and analyzing the contents of talc. Colgate argues that Dr. Moline and Dr. Kradin do not offer opinions based on their own expertise that Cashmere Bouquet contained asbestos. Rather, Colgate asserts that Dr. Moline and Dr. Kradin merely summarize the work of others, Gordon and Fitzgerald, and that Chapp is attempting to use them as a mere conduit for Gordon and Fitzgerald's opinions.[12]    Citing **Walworth County v. Therese B.**, 2003 WI App 223, ¶9, 267 Wis. 2d 310, 671 N.W.2d 377, Colgate argues that "WIS. STAT. § 907.03 does not give license to the proponent of an expert solely as a conduit for the hearsay opinions of others."

¶40    Chapp responds to Colgate's argument stating that Wisconsin law, WIS. STAT. § 907.03, expressly allows an expert to rely on inadmissible evidence if of a type reasonably relied on by experts in the field in forming an opinion or inference. The problem with Chapp's argument is that § 907.03 only permits the witness to rely on otherwise inadmissible data *if* the expert witness is testifying within his or her expertise. *See* **Green v. Smith & Nephew AHP, Inc.**, 2000 WI App 192, 238 Wis. 2d 477, 617 N.W.2d 881. As we explain below, neither

---

[12] As noted earlier, Chapp listed Gordon and Fitzgerald as experts, but later removed them from his expert witness list.

Dr. Moline nor Dr. Kradin are qualified to express opinions about whether Cashmere Bouquet was tainted by asbestos during the time that Ruth was allegedly exposed to asbestos in that product.

¶41   In her report, Dr. Moline states that she is a physician specializing in the field of occupational and environmental disease.   She explains that occupational medicine is the field of medicine that deals with exposures to substances, toxins, conditions, and agents in the workplace that are associated with increased risks of diseases.   She states that "[t]o put it simply, Occupational Medicine and Preventive Medicine involves searching for and identifying causes of diseases."   Nothing in Dr. Moline's education, training or experience involved analyzing talc powder or talc to determine whether any accessory minerals including asbestos were present.

¶42   By contrast Colgate's expert, Matthew Sanchez, Ph.D., describes very complicated test and analysis procedures used to determine whether talc contains asbestos.[13]   He describes the education, training, experience, and technical equipment necessary for determining whether talc contains asbestos.  He states that the only analytical protocol currently recognized by the FDA for certifying talc as "asbestos-free" for use in or on the body is the USP MONOGRAPH FOR TALC.  *See* UNITED STATES PHARMACOPEIA CONVENTION, UNITED STATES PHARMACOPEIA 32:TALC (Aug. 1, 2011).  He explains that the USP MONOGRAPH FOR TALC requires testing by x-ray powder diffraction to determine if serpentine

---

[13] This discussion of the nature of the methods of testing and analyzing talc for the presence of asbestos is only to compare the expertise of those who actually analyze talc for the presence of asbestos and Dr. Moline and Dr. Kradin's expertise and knowledge about whether Cashmere Bouquet contained asbestos.

or amphibole minerals are present and, when those minerals are detected, optical microscopy is employed to determine whether the suspect minerals are asbestos or non-asbestos based on the minerals' morphology. He goes on to describe a variety of other analytical tools for analyzing talc for asbestos—x-ray powder diffraction, polarized light microscopy, and electron microscopy.

¶43     Sanchez also comments on the reliability of historical tests and studies to determine whether asbestos was present in talc and criticizes the methodology used in many of the tests. He then cites a 1986 review by the FDA of whether cosmetic talcum powder should be affixed with a warning label:

> During the early 1970s, FDA became concerned about the possibility that cosmetic talc did contain significant amounts of this material. The agency received several reports about such contamination. However, at that time, the analytical procedures for determining asbestos in talc were not fully developed, and most of the analytical work was conducted without scientific agreement as to which methods were well-suited for the identification of asbestiform minerals in talc. Consequently, FDA considered all analytical results to be of questionable reliability. This assessment proved to be correct because many questions were subsequently raised about results reported in the literature in the early 1970's.

In other words, Sanchez's report reflects how complicated the testing and analysis procedures are for determining whether talc is contaminated by asbestos. Those who are qualified to perform those tests and analysis have different education, training, and experience not possessed by a physician. He also points out that there have been disputes among experts in the field about how the testing and analysis should be performed.

¶44     Several Wisconsin decisions address the issue of when an expert may rely on inadmissible evidence under WIS. STAT. § 907.03. In *Green*, this

court held that pursuant to § 907.03, the trial court should not have admitted an expert's opinion that the latex gloves used were not safe. *See id.*, 238 Wis. 2d 477, ¶24. Green claimed, and a jury found, that latex gloves manufactured by Smith & Nephew were defective and unreasonably dangerous, and they were a cause of damages Green suffered as a result of her allergic reaction to them. *See id.*, ¶1. On appeal Smith & Nephew asserted that it was entitled to either dismissal of Green's action or a new trial because, in part, the trial court erroneously allowed an expert, Paul Cacioli, to testify that the latex gloves were not safe. *Id.*, ¶¶5, 18. Cacioli held a Ph.D. degree as a chemist and was employed as a Director of Research and Development and Technical Affairs by the company that purchased Smith & Nephew's latex-glove business. *Id.*, ¶19. The trial court read a summary of excerpts from Cacioli's deposition testimony to the jury, noting that Cacioli believed that the latex gloves manufactured by Smith & Nephew had "high" protein levels and that Cacioli "considered these levels unsafe and unacceptable." *Id.* (one set of quotation marks omitted).

¶45 Concluding that the trial court should not have admitted Cacioli's opinion that the latex gloves were not safe, this court stated:

> This was Green's syllogism: Cacioli is an expert in the chemistry of making latex gloves, he wanted to make latex gloves with lower protein levels … because he believed gloves with lower protein levels were safer, thus he could give an expert opinion that gloves with high protein levels are less safe than gloves with low protein levels. This argument implicates WIS. STAT. § 907.03, which permits an expert witness to rely on inadmissible data if the data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inference upon the subject." But this rule only permits the witness to rely on otherwise inadmissible data (here, the opinions of unknown persons who did not testify) *if* the expert witness is testifying with his or her expertise. *See Lemberger v. Koehring Co.,* 63 Wis. 2d 210, 218, 216 N.W.2d 542, 546

(1974). A simple example will illustrate this point. If Albert Einstein, an admitted expert on relativity, believes that in working out his theories on a chalk board he should use Brand X of chalk because he has heard that Brand X contains less of a potentially harmful substance than does Brand Y, Einstein's opinion about chalk safety would not be admissible in a products-liability lawsuit to prove that Brand Y chalk was less safe than Brand X—the safety of chalk is not within his area of expertise.

See *Green*, 238 Wis. 2d 477, ¶23.

¶46 Additionally, *Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 218, 216 N.W.2d 542 (1974), is instructive on this issue. Lemberger was a construction worker who suffered a depressed skull fracture when a sixteen pound block of wood fell from a crane and allegedly hit him on the head—he was not wearing a hard hat when the injury occurred. *See id.* at 213, 215. Lemberger sued the manufacturer of the crane and during the course of the trial, the manufacturer presented testimony from neurologist Dr. Millen who gave his opinion that serious injury would have been prevented if Lemberger had been wearing a hard hat.[14] *Id.* at 218.

¶47 Lemberger appealed the admission of that testimony. *See id.* at 217-18. The court ruled that the neurologist's testimony exceeded his expertise:

[W]e see no basis for the admission of Dr. Millen's deposed testimony. Dr. Millen is a neurologist, who specializes in psychology and the physical disorders of the nervous system. He may well be an expert on personal injuries, and it was agreed that he had some knowledge of the basic laws of physics involving the forces asserted by falling objects. He was permitted, however, to express the opinion that, had Lemberger been wearing a hard hat,

---

[14] Dr. Millen's given name is not included in the decision. *See Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 217-18, 216 N.W.2d 542 (1974).

serious injury would have been prevented. That opinion was not within the field of Dr. Millen's expertise …. He had no expertise or special knowledge on the capacity of a hard hat to withstand impact and to prevent a skull injury. To the extent that Dr. Millen was permitted to testify as an expert on the protective capacity of the hard hat, his opinion was beyond his qualifications and should have been excluded by the trial judge. He did not have "such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth."

See *id.* at 217-18 (citation and one set of quotation marks omitted).

¶48    It is apparent that the issue in this case—whether talc and particularly, Cashmere Bouquet, contained asbestos—involves expert against expert opinions. Thus, it is required that experts with the education, qualifications, and experience in testing and analyzing whether talc is contaminated by asbestos, be the ones who express opinions about the issue. An expert who is not qualified to do so cannot attempt to use WIS. STAT. § 907.03 to act as a mere conduit to introduce the testimony of a possibly qualified expert.

¶49    Based on that background, we conclude that Dr. Moline's education, training, and experience do not qualify her to express an opinion on whether Cashmere Bouquet ever contained asbestos. Dr. Moline does not express her own independent opinion that Cashmere Bouquet contained asbestos based on any testing or analysis she did to determine whether Cashmere Bouquet ever contained asbestos—she is not qualified to express such an opinion. Rather, Dr. Moline merely parrots Gordon's study. She cites, in detail, the methodology Gordon describes in his study and further states that the product Gordon studied was Cashmere Bouquet.

¶50     Colgate responded that the article by Gordon, cited by Dr. Moline, never identifies Cashmere Bouquet as the brand of talc powder that he analyzed. Chapp does not refute Colgate's assertion in his reply and, therefore, concedes this fact. *See* ***Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.***, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (stating that failure to refute an argument constitutes a concession).

¶51     Clearly, Dr. Moline is not expressing her independent opinion based upon any education, training, or experience that Cashmere Bouquet contained asbestos—she is merely acting as a conduit for Gordon's opinions.  Thus, we conclude that like the opinions of Caioli and Dr. Millen discussed above, Dr. Moline's opinion that Cashmere Bouquet contained asbestos was outside her area of expertise.

¶52     For the same reasons, we conclude that Dr. Kradin's opinion that Cashmere Bouquet was contaminated by asbestos was outside his area of expertise.  In his expert report, Dr. Kradin states that he has specialized in pulmonary medicine.  He *routinely reads the literature* concerning fiber released from various asbestos containing products.  He is familiar with what has been published with regard to the level of asbestos in ambient air.  In his deposition testimony in this case  Dr. Kradin testified as follows:

> I *think the literature would indicate* that much of the material that is used in certainly Cashmere Bouquet is contaminated, or was contaminated, and that *more likely than not*, over the course of the time period that [Ruth] was using these materials, she would have been exposed to Cashmere Bouquet at levels that were well above background.

(emphasis added.)

¶53 Dr. Kradin's report and his testimony reflect that he has no education, training or experience in testing or analyzing talc to determine if any talc is contaminated by asbestos. He is merely relying on literature that he read and at best he *thinks the literature would indicate* that Cashmere Bouquet was contaminated during the time period that Ruth was using it. Clearly, he has no independent scientific knowledge that Cashmere Bouquet was contaminated by asbestos. Thus, we conclude that like the opinions of Caioli and Dr. Millen discussed above, Dr. Kradin's opinion that Cashmere Bouquet contained asbestos was outside his area of expertise.

¶54 As noted, an expert who is not qualified to do so cannot attempt to use WIS. STAT. § 907.03 to act as a mere conduit to introduce the testimony of a possibly qualified expert. Thus, we conclude that both Dr. Moline and Dr. Kradin's opinions were not admissible under § 907.03.[15] Therefore, the trial court properly did not consider their opinions that the Cashmere Bouquet that Ruth used was contaminated by asbestos.

## CONCLUSION

¶55 For the reasons stated above, we conclude that the evidence on causation was insufficient to remove the issue from the realm of speculation. Therefore, we affirm the trial court's summary judgment order.

---

[15] Chapp also argues that, at the summary judgment stage, it is permissible for Dr. Moline to rely on the evidence to support her opinions that cosmetic talc has routinely been shown to be contaminated with asbestos. Chapp cites no authority for this argument and does not develop the argument. Chapp's assertion is not supported by any citation to legal authority and is not developed. Thus, we decline to further consider the assertion. *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.